UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LISA PETERSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:09-628 |
| | ) | |
| JAMES DEAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Twelve former county election administrators filed suit in this Court, claiming that their First and Fourteenth Amendment rights were violated when they were removed from their jobs because of their actual, or perceived, political party association. On December 14, 2010, Judge Wiseman entered an Order (Docket No. 154) dismissing any claimed violations of state law, and finding that Defendants, as state officials, were not liable for monetary damages in either their official or individual capacities. Thereafter, on March 5, 2012, the undersigned entered an Order (Docket No. 201) dismissing Plaintiffs' claims for injunctive and declaratory relief against Defendants in their individual capacities, but leaving for consideration Plaintiffs' request for declaratory and injunctive relief against Defendants in their official capacities. Subsequently, Defendants filed Motions for Summary Judgment and/or Motions to Dismiss. (Docket Nos. 202, 203, 213, 216, 222, 225, 228, 231, 234, 237 & 240).

A common question in each of the dispositive motions is whether the position of administrator of elections is a patronage position. Recognizing that resolution of this common issue could be outcome determinative as to many of the motions, and also that a ruling on the question

1

could serve as a basis for an interlocutory appeal, the Court held a status conference with the parties (at their request) on February 15, 2013. During the course of the conference, the Court indicated that, in an effort to streamline matters, it would issue an opinion on the patronage question.[1] This is that opinion.

**I.**

Plaintiffs served as the administrator of elections in their county of residence until they were terminated, or allegedly constructively discharged. Their departures from office came on the heels of the appointment of new county election commissioners.

Plaintiffs claim that Defendants, prior to appointment as county election commissioners, met with members and officials of the state and county Republican Party and certain elected Republican members of the state legislature. In the meetings, and allegedly as a condition of their appointment, Defendants agreed to terminate Plaintiffs' employment and appoint a member or supporter of the Republican Party to replace Plaintiffs as the administrator of elections in their respective counties. Plaintiffs also contend that, prior to public meetings of each county election commission, Defendants in each county met privately and agreed to vote to terminate Plaintiffs' employment.

Each Plaintiff was replaced with a member or supporter of the Republican Party, and Plaintiffs assert that but for their political affiliation they would still be the administrator of election for their respective counties. It is Plaintiffs' position that Defendants' acts of meeting with and promising state and county Republican Party officials to vote to terminate their respective counties' administrators of elections in exchange for an appointment to their respective county election

---

[1] The Court also stated that, because its ruling would seriously impact the continued viability of each Plaintiff's claim one way or the other, the pending Motions to Dismiss and/or for Summary Judgment would be denied as moot. Said denial, of course, is without prejudice to refiling dispositive motions (if warranted) in light of the Court's present ruling.

commissions constitutes a conspiracy to terminate Plaintiffs' employment solely because of their actual or perceived political party affiliation.

## II.

"The First Amendment generally proscribes the termination of a public employee based on the employee's political beliefs or affiliation." O'Connor v. Twp. of Redford, 428 Fed. Appx. 600, 604 (6th Cir. 2011). This is because [a]llowing the government to deny a benefit to an individual because that individual exercised his First Amendment rights presents two principal dangers[:]

> First, the inevitable tendency of a system of party patronage is to coerce employees into compromising their true political beliefs. . . . The second danger, which is related to the first, is that the denial of a government benefit on account of a person's political beliefs is in effect a penalty for holding those beliefs; permitting the state to impose such a penalty would constitute an "unconstitutional condition" that would allow the state to indirectly interfere with an employee's constitutional rights in a manner that it could not accomplish directly."

Lane v. City of LaFollette, 490 F.3d 410, 418-19 (6th Cir. 2007) (internal citations omitted). In fact, "[s]ince the Supreme Court issued its opinion in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), patronage dismissals ( i.e., dismissals for failure to support a particular party or candidate) have been, in general, unconstitutional." Caudill v. Hollan, 431 F.3d 900, 908 (6th Cir. 2005).

Nevertheless, the Supreme Court in Elrod "recognize[d] that party affiliation may be an acceptable requirement for some types of government employment." Branti v. Finkel, 445 U.S. 507, 517 (1980). "Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Id. (citing, Elrod, 427 U.S. at 366).

"[W]hether a particular job is entitled to First Amendment protection from patronage

3

dismissals" is a "legal question[,]" to be decided by the Court. O'Connor, 428 Fed. Appx. at 603 (collecting cases). As a general proposition, "party affiliation may be an acceptable requirement" for those in "policymaking" or "confidential" positions, but those descriptive labels are "not the ultimate inquiry." Lane, 490 F.3d at 419. "Instead, the test is 'whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" Id. (quoting, Branti, 455 U.S. at 518). "In answering this question, the Court looks not to the position as it was performed by the terminated employee, but instead to the inherent duties of the position, and to the duties that the new holder of that position is expected to perform." Id.

As an aid in determining whether the actual duties of specific positions are such that individuals "may be dismissed on the basis of their political affiliation without violating the First Amendment," Sowards v. Loudon County, 203 F.3d 426, 435 (6th Cir. 2000), the Sixth Circuit has established four categories of positions that are deemed to fall under the Elrod-Branti exception:

> **Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> **Category Two**: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
>
> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made

by different governmental agents or bodies.

McCloud v. Testa, 97 F.3d 1536, 1557 (6th Cir. 1996) (citation omitted). "If a particular position falls into one of these categories, then political affiliation is an appropriate consideration for that position[.]" Sowards, 203 F.3d at 436.

In this case, Defendants take the position that the administrator of elections falls into either category one, two or three. They assert that the position itself is a category one position and, therefore, the inquiry ends because the administrator is subject to patronage dismissal. Alternatively, Defendants argue that the election commissioners hold category-one positions which opens up the possibility that the administrator can be subject to dismissal as a category-two or category-three employee. In response, Plaintiffs argue that they fall within none of the categories, but they concede that the county commissioners are category-one employees. (Docket No. 270 at 3-4).[2]

### III.

The State Election Commission is a statutory creation. Codified at Tenn. Code Ann. § 2-11-101, the State Election Commission presently consists of seven members, four of whom are to be members of the majority party, three of whom are to be members of the minority party, and all of whom "shall first be nominated by a joint senate house caucus of the members of the party of which such person is a member." Tenn. Code Ann. §§ 2-11-103 (a) & (b).[3]

---

[2] This concession is made because, as explained below, the Tennessee State Election Commission is partisan by statute, and that body appoints the county election commissioners who are also, necessarily, partisan.

[3] At the time this case was filed, the Tennessee Election Commission was comprised of five members, three of whom were from the majority party, and two of whom were from the minority party. The number was increased effective April 26, 2011.

The State Election Commission is required to appoint five election commissioners for each county in Tennessee, three of whom "shall be members of the majority party " and two of whom "shall be members of the minority party." Tenn. Code Ann. § 2-12-103(a). The five so appointed comprise the county election commission and these commissioners hold office for two years. Tenn. Code Ann. § 2-12-101.

Each county election commission, in turn, is required to "appoint an administrator of elections, who shall be the chief administrative officer of the commission and shall be responsible for the daily operations of the commission office and the execution of all elections." Tenn. Code Ann. § 2-12-116(a)(1). The appointed administrator is required to have a high school diploma or GED, and "[i]n evaluating a prospective appointee, the commission shall consider the knowledge and experience of such prospective appointee in the following areas: administrative, managerial, instructional, communication, budgetarial, purchasing, promotional, legal and general office skills and other related skills necessary to fulfill the statutory requirements of administrator." Id.

The job duties of the administrator are also prescribed by statute. Specifically, Tenn. Code Ann. § 2-12-201 provides that his or her "duties include, but are not limited to, the following":

(1) Employment of all office personnel . . .

(2) Preparation of the annual operating budget and presentation of such budget to the election commission for approval;

(3) Upon approval by the county election commission, presentation of the annual budget to the county commission or other legislative body for funding;

(4) Requisition and purchase of any supplies necessary for the operation of the election commission office and the conduct of all elections;

(5) Maintenance of voter registration files, campaign disclosure records, and any other records required by this title;

(6) Conducting of instruction class for poll workers or designation of another qualified person to conduct such class;

(7) Preparation of all notices for publication required by this title;

(8) Preparation and maintenance of all fiscal records necessary for the daily operation of the election commission office and all elections. This may include any requests for funding or changes in funding, if necessary, after adoption of the current fiscal budget;

(9) Compilation, maintenance and dissemination of information to the public, the candidates, the voters, the press and all inquiring parties in regard to all aspects of the electoral process on all governmental levels;

(10) Promotion of the electoral process through supplemental registrations, public functions, press releases and media advertising whenever possible;

(11) Attendance at any required seminar and other educational seminars, as funding permits, to gain knowledge beneficial to the administration of the election commission office or to the electoral process;

(12) Having knowledge of all current laws pertaining to the election process and any changes mandated by the general assembly, and apprising the election commission, office staff, candidates, the press and the public in general of this information;

(13) Assistance in the planning and implementation of any plan of apportionment or reapportionment of any governmental entity involved in the electoral process;

(14) The county election commissioners may not employ themselves or any of their spouses, parents, siblings, in-laws or children as administrator;

(15) Preparation of a plan for placing precinct voting locations and presentation of such plan to the election commission for approval;

(16) Preparation of a plan for early voting sites and presentation of such plan to the election commission for approval; and

(17) Upon request, assist the:

    (A) City councils, as appropriate, for cities located in the county;

    (B) County legislative body;

    (C) Local board of education; and

> (D) Members of the general assembly representing the county, concerning redistricting in 2012, and thereafter every two-year period following each decennial census taken by the United States census bureau.

Id. §§ (a)(1-17).

## IV.

Given that the Tennessee Election Commission, by statute, is directed to consist of a precise number of majority and minority party members, and further given that the Commission appoints the county election commissioners, the Court has no problem in concluding, as the parties to this case seem to agree, that the county commissioners are all category-one employees. It does not follow, perforce, however, that the county administrator, too, is a category-one employee.

In McCloud, the Sixth Circuit provided "a secretary of state given statutory authority over various state corporation law policies" as a prime example of a category-one employee. McCloud, 97 F.3d at 1557. The duties of a Tennessee county election administrator do not fall into that realm, and this conclusion remains despite Defendants' heavy reliance on Summe v. Kenton County Clerk's Office, 604 F.3d 257 (6th Cir. 2010).

Summe involved a claim by a former chief deputy county clerk, who was defeated in her campaign for election to position of county clerk, and then terminated (or at least not rehired) by the new, incoming clerk. In rejecting plaintiff's argument "that her position as Chief Deputy cannot be classified as a McCloud category-two position because the position of County Clerk is not a category-one position," id. at 267, the Sixth Circuit wrote:

> The position of County Clerk is established by the Kentucky Constitution. It is an elected position with a term of four years. Pursuant to the Kentucky Revised Statutes, County Clerks are responsible for issuing motor vehicle, marriage and vending licenses, registering voters and performing other election-related duties, storing various legal and county records, and preparing county tax bills. Under

8

> McCloud, a category-one position is a position specifically named in federal, state, county or municipal law to which discretionary authority with respect to enforcement of that law is granted. . . . County Clerks are charged with enforcing the law regarding the issuance of licenses, the registration of voters and the running of elections, and the storage and maintenance of legal and governmental records. County Clerks presumably have discretionary authority regarding how to facilitate these numerous and varied duties. We, thus, conclude that the position of County Clerk is a McCloud category-one position.

Id. (internal citation omitted).

If anything, Summe supports the proposition that members of the county election commission are, like the County Court Clerk, category-one employees, while the administrator of elections is more akin to the position of Chief Deputy. By statute, the county election commission is required to post notice of all upcoming elections, Tenn. Code Ann. § 2-12-11, and provide the coordinator of elections with assorted information, including the number of active and inactive voters, the number of new voters, the number of registrations received from various databases, and the number of confirmation notices sent, Tenn. Code Ann. § 2-12-114. The county election commission is also required by statute to "promulgate such policies as are necessary to aid the personnel of the election commission office in the performance of their duties with regard to the promotion of voter registration and the electoral process." Tenn. Code Ann. § 2-12-116. These duties include the approval of an "annual budget for the operation of the election commission"; approval of "any voting equipment to be purchased by the county for use by the commission"; hiring of "legal counsel if necessary to conduct the business of the commission"; appointment of voting machine technicians; certifying and canvassing of all voting machines after each election; locking, sealing and retaining all absentee ballot boxes; assisting election commission personnel on election day; acting as "the central absentee counting board" in certain circumstances; certifying election results and expenses; determining the opening hours of polling places; and keeping the minutes of

commission meetings. Id.

Obviously, the members of the county election commission are not expected to personally shoulder all of the job duties they are tasked with performing. Quite the contrary, the county commission is required to hire an administrator who, as indicated, is "responsible for the daily operations of the commission office and the execution of all elections." Id. §(a)(1). Moreover, and also by statute, many of the responsibilities of the county commission are effectively delegated to the administrator. For example, while the county election commission is required to approve an annual budget, approve voting equipment, and hire necessary legal counsel, it is to do so "upon the recommendation of the administrator." Id. §§ (a)(2)-(a)(4).

These specifics, as well as the overall interplay between the commission and the administrator who runs the daily operations of the office, suggest "that the position is one to which a significant amount of the total discretionary authority available to category-one employees has been delegated." Summe, 604 F.3d at 266. Just like the category-two Chief Deputy in Summe, county election administrators, to a large extent, run the show for their appointing body, the county election commission.

Moreover, election administrators are at-will employees whose terms, at least by inference, are tied to the terms of the county election commission. After all, county election commissioners serve two year terms and they are required to appoint the administrator of elections. See, Dingman v. Harvell, 814 S.W.2d 362, 365 (Tenn. Ct. App. 1991) (" the office of Chief of Police has no prescribed term and therefore at best the term of office is limited to that of the Board of Aldermen which is the appointing authority"); Gambling v. Town of Bruceton, 803 S.W.3d 690, 693 (Tenn. Ct. App. 1991) ("The city charter provides for no fixed term of office for the town recorder and

therefore the term of office cannot extend beyond the two-year term of office of the appointing authority, the Board of Aldermen.").

Alternatively, and based upon the same analysis, the administrator of elections is a McCloud category-three employee because they "spend a significant portion of their time on the job advising" the election commissioners "on how to exercise their statutory or delegated policymaking authority," or "control the lines of communications to" the commissioners.[4] McCloud, 97 F.3d 1557. The Court reaches this conclusion in light of the fact that, for purposes of "the Elrod–Branti exception, McCloud does not require that a government position fall neatly within one of [the four] generic categories." Feeney v. Shipley, 164 F.3d 311, 318 (6th Cir. 1999). Moreover, the Elrod-Branti exception "is to be construed broadly, so as presumptively to encompass positions placed by the legislature outside of the 'merit' civil service," and, accordingly, even "if there is any ambiguity about whether a particular position falls into any of the [the categories] (and so also within the [Elrod-]Branti exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law[.]" McCloud. 97 F.3d at 1542 & 1557.

## V.

In opposing the motions to dismiss or for summary judgment on the patronage issue, Plaintiffs rely primarily upon a handful of decisions dating back to 1911 in which the Tennessee Supreme Court has opined that county election administrators (formerly known as coordinators) and the county election commission are ministerial offices. In the Court's opinion, those decisions must

---

[4] "[T]he lines-of-communication subset of category three focuses on those who control the lines of communication with the general public and its representatives," and "[c]ontrol over such lines of communication, even at a fairly low and non-policy making level, will suffice to remove a position from the protection against political dismissals." Justice v. Pike County Bd. of Educ., 348 F.3d 554, 563 (6th Cir. 2003).

11

be read in the context in which they were decided.

For example, in City of Memphis v. Shelby County Elec. Comm., 146 S.W.3d 531 (Tenn. 2004) which is heavily relied upon by Plaintiffs, the Tennessee Supreme Court stated that "the Commission and the Coordinator respectively perform important functions vital to the maintenance and advancement of our political system," but "[n]onetheless, as ministerial officers, the Commission and the Coordinator have limited discretion." Id. at 535. The court did so, however, in deciding whether the enabling statute "require[d] or even permit[ted] the Commission to refuse to include a referendum question on the ballot because the Commission believes the question to be substantively unconstitutional." Id. Similarly, in Shelby County Elec. Comm. v. Turner, 755 S.W.2d 774, 776 (Tenn. 1988), the Tennessee Supreme Court stated that, "[b]asically, the Election Commission has only ministerial duties," but did so in determining whether the office of the clerk of the juvenile court for Memphis and Shelby County should be placed on the ballot in the upcoming county general election.

Admittedly, the Tennessee Supreme Court used broad language in its opinions on the functions of administrators and the county election commissioners. For at least a couple of reasons, however, the Court is of the view that it would be a mistake to read those cases as suggesting that the administrator and the commission to which he or she reports do not fall within the Elrod-Branti exception, or that the only functions they perform are ministerial.

Even though the Tennessee Supreme Court in City of Memphis quoted Curtis v. State, 43 S.W.2d 391 (1931), for the proposition that the duties of commissioners of election are only ministerial, the court in Curtis made the statement where it was "not controverted" that the commission's duties "as a canvassing board" were ministerial, and went on to state it was "also true

that some discretion must be reposed in the commissioners" even in the area of canvassing.

Additionally, many who hold patronage positions are, no doubt, often required to perform ministerial duties as a part of their job, but this does not mean that the position cannot fall within the Elrod-Branti exception. See, Rice v. Ohio Dept. of Transp., 14 F.3d 1133, 1142 (6th Cir. 1994) ("all politics is local, as the saying goes, and the paper-shuffling functions of the transportation department's top political people in the field did not make their jobs any more 'unpolitical' than did the routine typing and filing performed by the secretary of the mayor in the Faughender [v. City of North Olmstead, 927 F.2d 909 (6th Cir. 1991)] case"). Indeed, while the administrators perform many ministerial functions as recognized by the Tennessee Supreme Court, the administrators are also responsible for recommending the budget, among other discretionary roles, including hiring and supervising employees. See, Dixon v. Univ. of Toledo, 702 F.3d 269, 276 (6th Cir. 2012) (finding assistant vice principal of human resources had been delegated "significant discretionary authority," including hiring and firing and supervising forty employees); Blair v. Meade, 76 F.3d 97, 100 (6th Cir. 1996) ("Money consistently plays a very important role in politics. As a result, budgetary decisions are among the most significant, and the most political, actions which government officials take").

## VI.

This Court's opinion that the job of county administrator of elections falls within the Elrod-Branti exception as either a McCloud category-two or category-three position is based upon two fundamental assumptions. First, the Court assumes for purposes of this ruling that Plaintiffs were, in fact, dismissed as a result of their actual or perceived political beliefs because the Sixth Circuit employs a burden-shifting framework for First Amendment retaliation claims in which Plaintiffs

must first establish a causal connection between their terminations (or non-reappointment) and their political allegiance.  See, <u>Dye v. Office of the Racing Comm'n</u>, 702 F.3d 286, 294 (6th Cir. 2012). Second, the Court assumes that the actual duties performed or expected to be performed by the Plaintiffs in this case are in keeping with those listed in the relevant state statues.  With those caveats, the Court will issue an Order confirming this ruling.

*[signature: Kevin H. Sharp]*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE